S. AMANDA MARSHALL, OSB #95347
United States Attorney
District of Oregon
**STEPHEN F. PEIFER, OSB #74252**
Assistant United States Attorney
Steve.Peifer@usdoj.gov
1000 SW Third Ave., Suite 600
Portland, OR  97204-2902
Telephone:  (503) 727-1000
Facsimile:  (503) 727-1105
Attorneys for United States of America

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **6:06-CR-60011-AA-08** |
| | **6:13-CR-00465-AA-01** |
| v. | **6:13-CR-00471-AA-01** |
| **REBECCA JEANETTE RUBIN,** | **GOVERNMENT'S SENTENCING** |
| | **MEMORANDUM** |
| **Defendant.** | |
| | **Sentencing: January 27, 2014,** |
| | **at 2:00 p.m.** |

The United States of America, by and through S. Amanda Marshall, United States

Attorney for the District of Oregon, and Assistant United States Attorney Stephen F. Peifer,

submits the following memorandum in support of the government's position on sentencing.  This

memorandum also represents the sentence recommendations of the United States Attorneys for

the District of Colorado and the Eastern District of California by virtue of Rule 20 transfers of

related cases in those districts.

**TABLE OF CONTENTS**

I.      INTRODUCTION..................................................................................... 2

II.     SUMMARY OF DEFENDANT'S ACTIVE CRIMINAL HISTORY ......................... 3

        A.      Planned Idaho Mink Release ................................................................ 3

        B.      BLM – Burns, Oregon ......................................................................... 4

        C.      BLM – Rock Springs, Wyoming ........................................................... 5

        D.      Vail Ski Resort................................................................................... 6

        E.      U.S. Forest Products – Medford, Oregon ............................................ 8

        F.      Bio-Devices – Orange, California......................................................... 10

        G.      BLM – Litchfield, California .............................................................. 10

III.    SENTENCING GUIDELINES DISCUSSION ......................................... 12

        1.      The Terrorism Guideline and Analogous Upward Departure............................ 12

        2.      Role in the Offense ........................................................................... 13

        3.      Vail Planning .................................................................................. 16

        4.      Total Offense Level Before Downward Departure.............................. 17

IV.     GOVERNMENT'S FINAL SENTENCE RECOMMENDATION........................... 17

V.      CONCLUSION ..................................................................................... 21

I.      **INTRODUCTION**

On Monday, January 27, 2014, defendant Rebecca Jeanette Rubin will be before the court

for sentencing on her pleas of guilty to arson, attempted arson and conspiracy to commit arson in

the District of Oregon, eight counts of arson in the District of Colorado, and one count of arson

in the Eastern District of California. The government agrees with the Probation Office's

guidelines calculations in the presentence report. Consistent with the plea agreement and the

factors of 18 U.S.C. § 3553(a), the government recommends a sentence of 90 months in custody covering the cases from all three districts.

Under both the guidelines and the § 3553(a) factors, it is helpful to summarize the facts, particularly in regard to defendant's involvement on a case-by-case basis. Also, the court should consider other relevant conduct, not included in the presentence report, indicative of defendant's four active years of criminal conduct in the United States and her years as a fugitive in Canada.

## II.    SUMMARY OF DEFENDANT'S ACTIVE CRIMINAL HISTORY

Defendant became interested in animal rights activism when she was 16 or 17 years old, while living in Ontario. After seeing an ALF video, she began her involvement in lawful, above-ground activities, including public protests. At age 18, upon moving to British Columbia, defendant began to associate with more radical elements such as Earth First! and individuals involved in criminal activities.

In 1997 defendant began dating David Barbaresh, a well-known animal rights figure, who introduced her to fellow Canadian Darren Thurston, her later co-defendant in this case. At their request, defendant became involved in long-range planning for an animal-release "action" at Bio-Devices, a medical research laboratory in Orange, California. This was the first indication defendant was deemed trustworthy enough to be in an ALF/ELF cell. The Bio-Devices attack was delayed for logistical reasons until 1999, but it was during this early period that she met future co-defendant Kevin Tubbs, whom she dated from December 1998 until 2000.

### A.    Planned Idaho Mink Release

While in Canada in 1997, defendant accepted an invitation from Tubbs to join a mink-release in Idaho. She traveled to Eugene and met with Jacob Ferguson, Tubbs and other cell

**Government's Sentencing Memorandum**                                                **Page 3**

members.  They went to the selected site in Idaho but aborted the action when they saw people riding around firing guns.

    **B.**    <u>**BLM – Burns, Oregon**</u>



**Participants:**

Rebecca Rubin
Jacob Ferguson
Kevin Tubbs
Josephine Overaker
William Rodgers

It was in 1997, also while in Canada, that Tubbs, Ferguson and other cell members asked defendant to participate in the attack on the Burns, Oregon, BLM wild horse facility.  Defendant set up an email account with Tubbs to communicate regarding the crime.  The site was targeted because BLM auctioned off horses that sometimes ended up in slaughterhouses.  Defendant's help was needed after Joseph Dibee of Seattle withdrew his participation.  Defendant kept the plan a secret from Thurston and Barbaresh.

Defendant took a bus from Vancouver, B.C., to Washington under her true name.  Then she used fake identification for a bus ticket to Eugene under an assumed name.  After meeting William Rodgers for the first time, defendant helped assemble and test incendiary devices in a Eugene house.  She wore gloves and a scarf to prevent fingerprints and contamination of the devices.

**Government's Sentencing Memorandum**           **Page 4**

On November 30, 1997, defendant and the others traveled from Eugene to Burns in Tubbs' van. At an isolated staging area east of town, they performed final preparations of the devices, checked radios and dug a hole for later burial of evidence. Defendant paired with Ferguson during the crime. While he set devices, she opened gates and released horses and burros. Before leaving, she witnessed another device placed at a large vehicle and the installation of a new lock on the outside gate to thwart any emergency personnel. Back at the staging area, they dumped clothing and shoes in the hole, poured acid on them, and covered the hole with dirt.

On the way back to Eugene, defendant and the other cell members discussed which group should claim credit for the crime. She wanted it claimed by the ALF, and they decided it should be both the ALF and the ELF. Although defendant did not contribute to the text of the communique itself, it is clear she agreed with its sentiment and purpose to coerce BLM to stop rounding up and auctioning wild horses.

The damage was $120,987.61 for equipment, $72,110.69 for structures, for a total of $193,098.30.

### C.    BLM – Rock Springs, Wyoming

In August – September 1998, defendant traveled from Canada to Eugene, initially to conduct the planned action at Bio-Devices, but it was not ready yet. Meeting in a Eugene area hotel, defendant and other cell members discussed upcoming activities at the Vail, Colorado, ski resort and another BLM horse facility in Rock Springs, Wyoming. Defendant, Ferguson, Tubbs, Rodgers, Josephine Sunshine Overaker, Stanislas Meyerhoff and Chelsea Gerlach traveled in two vehicles to the BLM site outside Rock Springs. After an encounter with law enforcement, they aborted the plan but buried some incendiary components near the highway for later use.

**Government's Sentencing Memorandum**                                    **Page 5**

On October 11, 1998, after their initial efforts at Vail (described below), defendant and others returned to Rock Springs to try again. Defendant had a radio and acted as a lookout. When she thought it was time, defendant opened the front gate and released horses. Instead of heading for open range, the horses immediately went into a Rock Springs neighborhood, and law enforcement was alerted. Placement of incendiary devices had to be prematurely aborted, with some evidence being left behind. ALF nonetheless on November 13, 1998, issued a press release/communique claiming responsibility for the failed action. ALF/ELF said it targeted the Rock Springs facility for "slaughtering horses for foreign dinner plates" and threatened future action if BLM did not "cease its campaign" against wild horses.

### D.    **Vail Ski Resort**



**Participants:**

Rebecca Rubin
Jacob Ferguson
Kevin Tubbs
Josephine Overaker
William Rodgers
Stanislas Meyerhoff
Chelsea Gerlach

According to defendant, she traveled from Canada to Olympia, Washington, met with Rodgers and proceeded with him to Eugene expressly for the planned attack on the Vail ski

**Government's Sentencing Memorandum**                                                    **Page 6**

facility.  Defendant's motivation for the Vail attack was similar to that of the other cell members – disapproval of human recreation taking priority over the needs of animals, particularly the Canadian lynx in Colorado.  The large group – defendant, Ferguson, Overaker, Tubbs, Rodgers, Meyerhoff and Gerlach – traveled to Colorado in two vehicles.

Defendant wore a backpack to carry containers full of fuel up the steep mountain, already snow-covered.  The jugs were camouflaged in white garbage bags and hidden for later use.  During a second ascent, she assisted in moving the fuel higher up the mountain so it could be closer to the site.  She found a secluded snow well in a grove of trees for the hiding place.  Defendant slept in Rodgers' truck during the several days of preparation.

Defendant and the others discussed logistical problems in their action, especially the need for more participants and the likelihood the timing devices would not work in the cold temperatures.  They decided to defer the action but left all the fuel in the hiding places on the mountainside.  Rodgers and Gerlach, however, returned to Vail after the second Rock Springs action.  On October 19, 1998, Rodgers retrieved the fuel defendant and the others had hidden, mounted the two peaks, and single-handedly spread the fuel and lighted the fires.  No incendiary devices were used.  Eight fires burned simultaneously and caused destruction of five structures at one site and three at a second, located over a mile apart.  The loss suffered by Vail Associates was $24,500,485.28.

Rodgers and Gerlach wrote the ALF/ELF communique claiming responsibility for Vail.  Although defendant was not involved in the communique, it simply stated the same rationale for the action that she had espoused with other cell members in preparing for it.  Stating that it was intended to protect the lynx habitat, ALF/ELF threatened a future action:

**Government's Sentencing Memorandum**                                    **Page 7**

> Putting profits before Colorado's wildlife will not be tolerated.
> This action is just a warning.  We will be back if this greedy
> corporation continues to trespass into wild and unroaded areas.
> For your safety and convenience, we strongly advise skiers to
> choose other destinations until Vail cancels its inexcusable plans
> for expansion.

When defendant and the others initially left Vail, they did so out of frustration that, despite all their planning and effort, the new resort would stand until they could return.  It turned out differently, of course, and defendant's goal was nonetheless fulfilled by Rodgers.  When she left Vail, instead of returning right away to Eugene, she and the other cell members went back to Rock Springs to attempt once again to destroy the BLM facility there, as described above.  Clearly, the initial frustration in Vail did not cause defendant to abandon her other objective of destruction and coercion against BLM.

### E. U.S. Forest Products – Medford, Oregon



**Participants:**

Rebecca Rubin
Jacob Ferguson
Kevin Tubbs
Kendall Tankersley

In late December 1998, defendant traveled from Vancouver, B.C., to Eugene for a social visit.  While there, she learned that Tubbs and Ferguson were already planning an attack on a forest products company in Southern Oregon and needed her help.  For the first time, defendant

**Government's Sentencing Memorandum**                                                    **Page 8**

met co-defendant Kendall Tankersley, Ferguson's girlfriend, who would be the fourth participant. Defendant was alarmed that Ferguson had brought a new member into the cell and had exposed defendant to her.

Shortly before Christmas, Tubbs drove defendant and the others to Medford for the planned arson of U.S. Forest Industries' headquarters building. While Tubbs waited in the van and Tankersley hid in a ditch and acted as lookout, defendant helped Ferguson carry incendiary devices and fuel to the site. Defendant stood guard with a radio next to Ferguson as he placed the items behind some bushes in front of the building. By signal from defendant's radio, Tubbs knew to pick them all up, and they headed back to Eugene.

Unbeknownst to defendant and the others, the devices malfunctioned and the initial arson attempt failed. Defendant learned in a post-Christmas meeting with cell members that Ferguson had returned to complete the job. When Ferguson had driven by the location en route to Sacramento for Christmas, he stopped and discovered that the buckets of fuel and the devices were still in place behind the bushes. On December 26-27, 1998, Ferguson and Tankersley returned to Medford. Ferguson installed a new ignition device, which activated the fuel defendant had earlier helped transport to the site. The huge fire gutted the office building, causing a loss of close to a million dollars.

In mid-January 1999, Tankersley drafted an obscene, abusive communique directed at the U.S. Forest Industries president. Defendant had nothing to do with the communique. She nevertheless played a crucial role in the initial effort to retaliate against the business by burning down the building in the hopes of forcing a change in its business policies. The communique, though crude in form, nonetheless expressed defendant's motivation against the forest products company.

**Government's Sentencing Memorandum**                                    **Page 9**

### F.    Bio-Devices – Orange, California

The long-planned ALF burglary and theft at Bio-Devices in Orange, California, finally occurred on August 28, 1999.  Defendant, Tubbs, Ferguson, Meyerhoff, Gerlach and other cell members traveled to Southern California.  Defendant waited on the premises in the cargo compartment of a rented Penske truck until called by radio.  Others forced entry, and defendant and Ferguson followed toward the dog cages.  Ferguson cut the locks and defendant stole the dogs, hooked them to leashes, and walked them to the truck.  Numerous other participants did the same, with a total of 46 dogs being stolen during the burglary.

### G.    BLM – Litchfield, California



**Participants:**

Rebecca Rubin
Kevin Tubbs
Stanislas Meyerhoff
Joseph Dibee
Jennifer Kolar
Darren Thurston
Brianna Waters

While in Canada, defendant was recruited to participate in the October 15, 2001, arson at the BLM wild horse facility in Litchfield, California.  She and Darren Thurston crossed illegally into the United States by foot at a wooded location near Cultus Lake.  Dibee and long-time cell member Jennifer Kolar picked them up in a car and took them to Dibee's Seattle residence.  These four, along with Meyerhoff, planned the Litchfield arson.

**Government's Sentencing Memorandum**                                    **Page 10**

Meyerhoff constructed the incendiary devices.  On October 12, defendant and Thurston washed Dibee's truck to eliminate fingerprints and trace evidence.  She and Thurston also gathered water bladders, flashlights, and other equipment.

On October 13, they left for Olympia, where Brianna Waters joined the group.[1]  In Eugene, they were joined by Tubbs.  They split into three vehicles and drove to Litchfield.  After checking on the BLM site, they camped nearby overnight.

About midnight on October 15, defendant and the others dressed in black clothing, gloves and socks covering their shoes.  While others performed the arson, defendant and Thurston went to the horse corrals, where they sawed and removed segments of fences.  Although they tried to funnel horses through paths constructed with snow fences, the plan didn't work well.  Given the signal, they all departed and drove separately back to Oregon using back roads.  Defendant and Thurston washed Dibee's truck in Seattle and walked back across the U.S. – Canada border at the same location used previously.

BLM suffered losses of $207,497.60, including destruction of a 135' x 35' barn.  Each incendiary device consisted of a five-gallon plastic bucket containing a mixture of gasoline and heavy petroleum distillate.  Unlike prior arsons, the devices had sophisticated delayed igniters with redundant dual timers.  The timers consisted of an electronic alarm clock functioning to complete an electric circuit between a nine-volt battery and a rocket igniter.  The igniter was placed between matches surrounding a road flare.  The road flare was on a lid above the bucket of fuel and served to ignite it.  The devices met the definition of incendiary bombs prohibited under federal law.

---

[1]  Waters, along with Kolar, had participated in the May 2001 arson at the University of Washington Urban Horticulture Center in Seattle.

**Government's Sentencing Memorandum**                                               **Page 11**

Thurston prepared and distributed the final communique from Canada.  Defendant took no part in it, but, as with the Burns and Rock Springs crime, it voiced her long-standing critique of BLM policies regarding wild horses.  It threatened future targeting of "industries and organizations that seek to profit by destroying the earth."

### III.    SENTENCING GUIDELINES DISCUSSION

These cases are not before the court on a clean slate.  In 2007 the court sentenced 10 of defendant's co-conspirators to prison terms ranging from 37 months (Thurston) to 156 months (Meyerhoff). In each co-defendant's case, the court made extensive guidelines rulings, several of which have application here.  Although the government took contrary positions regarding some of those rulings at the time, we do not contest their application where specifically appropriate here.  The government submits that, in the interests of consistency and proportionality, this defendant should be treated as equally as possible to her co-defendants in terms of guidelines calculations.  She is, however, being sentenced as an individual who committed specific criminal acts for which only she can be held accountable at this time.

### 1.    The Terrorism Guideline and Analogous Upward Departure

In the 2007 sentences of the co-defendants, the court declined to apply the terrorism guideline, USSG § 3A1.4, to any of the same offenses of conviction included in the present case.  These include the BLM – Burns arson (see Tubbs' sentencing) and the BLM – Litchfield conviction included in the present case (see Thurston's sentencing).  The government accepts those rulings and does not ask the court to reach a different result here.  In all the cases in 2007, however, the court granted the government's alternative request for a 12-level upward departure for aggravating circumstances under § 5K2.0, on the grounds that the guidelines do not adequately take into account defendant's intent to frighten, intimidate or coerce private

**Government's Sentencing Memorandum**                                              **Page 12**

individuals and corporations through her conduct. The court's ruling in this regard was expressly upheld on appeal in a co-defendant's case, *United States v. Tankerlsey*, 537 F.3d 110, 112-113 (9th Cir. 2008). The Ninth Circuit approved this court's intent to punish eco-terrorist activities directed at private conduct in a manner similar to how it punished eco-terrorist activities directed at the government. *Id.*

In paragraph 134 of the presentence report, the Probation Office concurs in application of a 12-level upward departure for the aggravating circumstances approved in *Tankersley* and recommended by the government. It is unknown whether defendant will object to this upward departure at this time.

### 2.    Role in the Offense

The presentence report, consistent with the plea agreement, recommends two-level downward adjustments for minor role, pursuant to USSG § 3B1.2(b), in each of the counts of conviction (PSR ¶¶ 59, 65, 71, 78). The government understands that defendant will seek four-level downward adjustments for minimal role under § 3B1.2(a) in two of the cases, U.S. Forest Industries and Vail. The government disagrees in both instances.

### a.    U.S. Forest Industries

In the *Tankersley* sentencing, this court declined a four-level reduction and noted that Tankersley "chose to return to the U.S. [Forest] Industries after the device did not ignite to ensure that a second arson attempt was successful." *Tankersley*, 537 F.3d at 1110. Defendant now uses this language as conclusive grounds that, unlike Tankersley, she should be considered a minimal participant since she did not return to complete the arson as Tankersley did. Defendant's position fails to appreciate, however, the importance of distinct differences in

**Government's Sentencing Memorandum**                                    **Page 13**

defendant's and Tankerlsey's conduct in the attempted arson and in the whole array of other relevant conduct.

Tankersley acted as a lookout for the attempted arson, hiding in a ditch across the street from the building.  Defendant, on the other hand, accompanied Ferguson to the building as his direct, on-scene assistant.  Defendant had a radio and used it to communicate with getaway driver Tubbs.  By her own account, she helped carry the fuel, stood behind Ferguson and watched his back from very close range.  Her role was crucial in ensuring that Ferguson successfully placed the fuel containers and devices behind the bushes.  Also, she played a crucial role in making sure their departure was prompt and unnoticed.  It was purely fortuitous that the devices failed, a result defendant clearly did not intend.  But defendant did not need to help Ferguson again when he returned for the actual fire, since the fuel she had helped place was already there.

"In determining whether a defendant was a minimal or minor participant in any criminal activity, a district court  . . . shall consider all conduct within the scope of § 1B1.3 (Relevant Conduct) not just conduct cited in the count of conviction."  *Tankersley*, 537 F.3d at 1110 (quoting *United States v. Hatley*, 15 F.3d 856, 859 (9th Cir. 1994)).  This process entails looking beyond the individual to the "overall criminal scheme." *Id.* (quoting *United States v. Demers*, 13 F.3d 1381, 1383 (9th Cir. 1994)).  "This is particularly appropriate when sentencing members of a pervasive and far [-] ranging criminal enterprise," such as "cells" that plan and carry out arsons with each member performing specific tasks. *Id.*

By the time defendant went to Medford for the U.S. Forest Industries attack in December 1998, she was an experienced, trusted member of a very active ALF/ELF cell.  She had traveled from Canada to plan and take part in "actions" at Burns, Rock Springs and Vail.  It is doubtful

**Government's Sentencing Memorandum**                                                    **Page 14**

any of the other cell members considered her a "minimal" participant at that point, as they had repeatedly recruited her to cross the border and commit highly secretive acts of violence. Tankersley, on the other hand, was inexperienced and relatively new to the cell, having come on board by virtue of being Ferguson's girlfriend. Her activity abruptly ended after U.S. Forest Industries, whereas defendant's continued to October 2001.

In the event the court agrees with defendant and concludes she was a minimal participant in the Medford crime, it would result in a further two-level reduction in the offense level for the Medford count, resulting in an Adjusted Offense Level (subtotal) of 16 for that count alone (see PSR ¶ 67). That reduction by itself, however, would not change the Total Offense Level of 23 (PSR ¶ 88) because the Multiple Count Adjustment (PSR ¶¶ 81-83) would not change.

    **b.**    <u>**Vail**</u>

There is an even stronger argument against a minimal-participant adjustment in the Vail arson. By her own admission, she came down from Canada for the express purpose of meeting with the cell and planning the mammoth Vail arson. She met William Rodgers in Olympia, and together they went to the Meyerhoff-Gerlach residence outside Eugene. The crime involved extensive planning, travel, and grueling physical effort – in all of which defendant was a full, active, willing participant. There were days of delay during which defendant remained actively involved, sleeping in Rodgers truck. Not once, but twice, she lugged heavy containers of fuel up the snow-covered mountain, making sure they were hidden in the snow in white bags positioned closer to the top.

Frustration set in due to the cold conditions and the lack of adequate participants. All but Rodgers and Gerlach abandoned Colorado, at least for the time being, but there was not abandonment of the project. Defendant and the others left the fuel in place with the hope of

**Government's Sentencing Memorandum**                                             **Page 15**

returning to complete the crime under different conditions and new planning. Defendant and other cell members went to Rock Springs for another try at the BLM facility, but Rodgers came back to achieve the ultimate result they all (including defendant) had worked so hard for. Acting alone, Rodgers spread fuel at two mountaintop sites about a mile apart, causing total destruction of several structures. He could not have done this, however, if defendant had not hauled the fuel up the mountain and hidden it close by for his use.

As in the Medford crime, defendant was a confirmed, dedicated member of an ALF/ELF cell intent on destroying others' property for ideological purposes. Even more than in Medford, her Vail actions resulted from extended travel, planning and hard work. Her actions were essential to the plan's ultimate success, even in her absence. In no sense was she a minimal participant.

### 3.    Vail Planning

Defendant objects to the two-level increase for more than minimal planning in the Vail arson under USSG § 2B1.3(b)(3) (PSR ¶ 76). As with her role in the offense, she minimizes and restricts her conduct without due consideration of all relevant circumstances. Again, the Vail conspiracy and ultimately successful arson were an extensively planned endeavor. It involved international recruitment and travel, planning sessions in Oregon, cross-country road trips through several states, device assembly, transportation, camouflaging and hiding of heavy fuel containers, extended camping and subterfuge. It was a team effort in which defendant and every other cell member played crucial roles. The fact that it was temporarily abandoned (delayed might be a better term) and yet overwhelmingly successful in an unexpected manner in no way negates the substantial planning that went into the effort.

**Government's Sentencing Memorandum**                                    **Page 16**

#### 4.    <u>Total Offense Level Before Downward Departure</u>

The court should therefore reject defendant's objections to the offense level calculations in the presentence report.  The pre-departure Total Offense Level of 23 (PSR ¶ 88) is correct.  As in her co-defendant's cases (and as upheld by the Ninth Circuit in *Tankersley*), the court should assess a 12-level upward departure under USSG § 5K2.0 for the aggravated circumstances of defendant's intent to frighten, intimidate and coerce her victims (see PSR ¶ 134).  This results in an increase to level 35, with a guideline range of 168-210 months.  The government recommends a downward departure for substantial assistance to authorities, as discussed below.

### IV.    <u>GOVERNMENT'S FINAL SENTENCE RECOMMENDATION</u>

As noted in the plea agreement, the government acknowledges that defendant provided substantial assistance to authorities by voluntarily surrendering to law enforcement at the Canada-U.S. border, thereby obviating the need and expense for her formal arrest and extradition from Canada.  This is no small matter, given that extradition from any country often takes a lengthy period of time, considerable work by numerous officials in both countries, and expenditure of money and resources.

Also pursuant to the plea agreement, defendant met with agents of the government and gave a comprehensive account of her own criminal activities in the United States over several years.  This account included crimes – planned, attempted and completed – for which she has not been charged and in which the government did not previously have evidence of her participation.  These additional activities are included in the factual summary above.

Defendant elected, however, not to identify certain people with whom she conspired and committed the crimes in this case.  That, of course, is her right, but it restricts her usefulness.  This self-imposed limitation on her part makes her cooperation and assistance significantly less

**Government's Sentencing Memorandum**                                                    **Page 17**

valuable, particularly in the event fugitive co-defendants Joseph Dibee and Josephine Sunshine

Overaker are arrested and brought to trial.  As the government noted at the change of plea,

defendant may nonetheless be subject to compelled testimony in any trial of Dibee or Overaker,

but that does not increase the value of her assistance now in any way.

Defendant seeks a 60-month sentence, as authorized in the agreement.  The government

asks for a 90-month sentence under the plea agreement, achieved by a downward departure

under § 5K1.3 for substantial assistance.  If the court adopts the PSR's guideline calculations, the

90-month sentence can be achieved with a six-level downward departure.[2]

In deciding upon the appropriate sentence, the court faces a large array of factors, just as

in the ten co-defendants' cases in 2007.  For four full years, 1997-2001, defendant was a highly

dedicated and active member of an ALF/ELF cell.  Unlike the Oregon members, defendant had

to travel a long distance from another country to commit her crimes against the U.S. Government

and innocent private victims.  She had a criminal agenda at all times, particularly a personal

vendetta against the U.S. Bureau of Land Management.  Ordinarily a mild-mannered person,

defendant had no trouble committing crimes of violence.  Her actions were specifically designed

to terrorize the government and corporations into changing their policies, but that obviously did

not work.

As in the case of her co-defendants, late 2001 was a turning point.   The cell fell apart in

frustration as businesses and government facilities were rebuilt.  Cell members essentially grew

up, woke up and came to their senses, and their violence ended.  Not a small factor was 9/11,

which was a terrorism wake-up call for everyone.

---

[2] The greatest benefit to defendant in her plea agreement comes in the dismissal of the 30-year mandatory minimum charge for possession and use of a destructive device in the Eastern District of California indictment.

**Government's Sentencing Memorandum**                                              **Page 18**

Defendant was indicted in 2006, at a time when she was living a law-abiding existence in Canada. As a wanted subject, her picture was widely disseminated in Canada and the U.S. Instead of surrendering or at least attempting to negotiate her return to the U.S., defendant went underground for several years.

This office first became aware of defendant's interest in surrendering on her warrant in January 2010 through a telephone call from her attorney. That occurred four years after she officially became a fugitive from justice. During that time U.S. and Canadian authorities actively sought her whereabouts to no avail. Defendant, of course, could have avoided this delay by cooperating earlier, but instead chose to remain at large and hide. Even now the government is unaware of what defendant did during this interim period, where she was, and who may have harbored her, and she refuses to talk about it. For that matter, she has provided limited information in that regard covering her activities from 2010 to her actual surrender at the border in November 2012, other than her negotiation through Canadian and U.S. lawyers. No doubt she "suffered" while in hiding from 2006-2012, but that was suffering entirely of her own choice and causation.

It is clear that defendant had a change of heart sometime after the BLM-Litchfield attack, turning away from violence and wanton property destruction. Much the same can be said for most of her co-defendants, including some who are still serving long sentences. While repentance and change are important sentencing factors, they cannot erase four years of criminal conduct followed by several years of running from justice and a continuing desire to protect the last remaining fugitives.

Defendant's submissions to the court repeatedly emphasize her intelligence, kindness, civility, and mild disposition. Actually, she exhibited those same traits when, as "Little Missy,"

**Government's Sentencing Memorandum**                                        **Page 19**

she was a hard-core member of ALF/ELF. Her personality is likely the same, only age and experience have now tempered her radical ideology. Again, several of her co-defendants fit the same description.

Proportionality is important in a case with so many defendants. Some of her co-conspirators cooperated fully and received larger sentence reductions. Others, like defendant, refused to "name names" and got less benefit for it. None of the other sentenced defendants, however, was an international fugitive from justice, which makes this defendant's status unique.

The court knows from the earlier sentencings that this case has garnered substantial media coverage and, more important, intense scrutiny by like-minded ideologues who support "direct action" (i.e., law-breaking) in furtherance of extreme beliefs. For that reason, the concept of general deterrence is of more importance in this case than in most. After the ALF/ELF cell in this case disbanded in 2001, a new, younger generation of extreme activists has come of age. They look to defendant as a virtual heroine, not just for her criminal acts and years underground, but for her refusal to cooperate with the government against the two remaining fugitives. A sentence of 90 months, substantially greater than those of several full cooperators, (e.g., Kolar, Waters, Thurston, Savoie, Tankersley (see PSR at pp. 2-3)) would send a strong message to new would-be domestic terrorists and left-over advocates that crimes of violence and years of hiding simply don't pay.

For the first time in her life, the 40-year-old defendant is now claiming U.S. citizenship by virtue of her U.S.-born father. Because this claim is a matter subject to resolution by immigration authorities, the U.S. Attorney cannot comment on its merits at this time. If meritorious, it apparently could accrue to her benefit while in Bureau of Prisons' custody. But if defendant does gain U.S. citizenship, it undercuts her argument that, unlike every other

**Government's Sentencing Memorandum** **Page 20**

defendant in this case, she should be exempt from supervised release.  Even co-defendant Darren Thurston, a Canadian citizen, served three years of supervised release after his prison sentence. Defendant will owe $13,905,815.90 in mandatory restitution.  For that reason alone, a three-year term of supervised release is essential.  She has done nothing to merit special treatment afforded to none of her co-defendants.

## V.    <u>CONCLUSION</u>

Among the sentencing factors under 18 U.S.C. § 3553(a) that the court must consider are "the nature and circumstances of the offense and the history and characteristics of the defendant," and the need for the sentence "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," as well as "to afford adequate deterrence to criminal conduct."  As discussed above, and in full recognition of favorable factors cited by defendant, the government recommends a sentence of 90 months in custody, full restitution, and three years of supervised release.

Dated this 22nd day of January 2014.

Respectfully submitted,

S. AMANDA MARSHALL
United States Attorney

*s/ Stephen F. Peifer*
STEPHEN F. PEIFER, OSB #74252
Assistant United States Attorney
(503) 727-1000

**Government's Sentencing Memorandum**                                          **Page 21**