Richard J. Troberman, WSB No. 6379
Attorney at Law
520 Pike Street, Suite 2500
Seattle, WA 98101-1385
tmanlaw@aol.com
(206) 343-1111 (telephone)
(206) 340-1936 (facsimile)

Attorney for Defendant
Rebecca Rubin

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WASHINGTON
## AT EUGENE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 6:06-cr-60011-AA |
| | ) | No. 6:13-cr-00465-AA |
| v. | ) | No. 6:13-cr-00471-AA |
| | ) | |
| REBECCA RUBIN, | ) | **DEFENDANT'S SENTENCING** |
| | ) | **MEMORANDUM** |
| Defendant. | ) | |
| | ) | SENTENCING: January 27, 2014 (Portland) |

### I. FACTUAL BACKGROUND.

Between 1997 and 2001, Rebecca Rubin ("Rebecca" herein) was sporadically involved with a group of loosely aligned individuals on behalf of the Animal Liberation Front and the Earth Liberation Front. She has been charged in three separate indictments with committing a total of four arsons or attempted arsons. The first occurred on November 30, 1997 at the BLM Wild Horse Corral at Burns, Oregon, where Rebecca was a last minute recruit. In October of 1998, Rebecca was involved in an aborted attempt to commit an arson at Vail Colorado.[1] On December 22, 1998, Rebecca, again a last minute recruit, was involved in an unsuccessful arson attempt at

---

[1] The arson was successfully completed by other co-conspirators a few days later.

DEFENDANT'S SENTENCING MEMORANDUM - 1

U.S. Forest Industries in Medford, Oregon.[2]  The last offense in which Rebecca was involved was an arson at the BLM Wild Horse Corrals at Litchfield, California on October 15, 2001.  Following that arson, Rebecca returned to her home in Canada and had no further participation in any unlawful activity.

The specifics of these offenses, as well as numerous other offenses committed by various members of the conspiracy, are chronicled in the Government's Sentencing Memorandum filed in this Court on May 4, 2007.  The Court is well versed in the conduct attributed to Rebecca, and no useful purpose can be served by repeating the details here.  Suffice it to say, however, that the defendant, the Government, and the Probation Office all agree that Rebecca was substantially less culpable than the average participant in each of these offenses.  In fact, one of the lead investigators in the case, retired FBI Special Agent Jane Quimby, describes Rebecca as "a low level participant in the arsons," someone "who really walked the walk and talked the talk when it came to helping animals." *The Accidental Terrorist,* Petra Bartosiewicz, CounterPunch, January 14, 2011.  Significantly, Rebecca was never a member of the "Book Club;" never attended any of their meetings; and she had no involvement in drafting any of the communiques that were issued following each arson.

Rebecca ended her involvement in criminal activity following the Litchfield arson in 2001. She returned to Canada, where she re-directed her efforts in positive and constructive ways.  From 2001 to 2006 she worked with animals as a veterinary assistant and in wildlife rehabilitation.  She was fully invested in the work she had always wanted to do: healing and releasing (lawfully) healthy and well-equipped animals back into the wild, and had finally found her true calling.

---

[2]  That arson was successfully completed a week later by other co-conspirators.

DEFENDANT'S SENTENCING MEMORANDUM - 2

In 2006, Rebecca learned that she had been charged with these offenses. She was alarmed and terrified to see herself compared to Osama Bin Laden in the news, and she read that she could be facing up to life in prison. Fear overwhelmed her, and she could not bring herself to return to the United States. Years of living "underground," lonely and alone and in constant fear that she would be discovered, took its toll. Rebecca retained counsel in British Columbia and began the process of trying to resolve her case(s). In 2009 the undersigned counsel began a dialogue with the United States Attorneys Office in the District of Oregon in an effort to reach a resolution. After months of discussions and negotiations, a tentative agreement was reached with the Districts of Oregon and Colorado, and Rebecca was about to surrender. However, at the eleventh hour it was realized that Rebecca was also charged separately in the Eastern District of California. Despite the efforts of the United States Attorneys offices in both Oregon and Colorado to persuade the United States Attorney for the Eastern District of California to sign off on the proposed agreement, he would not agree to dismiss a 30 year mandatory minimum charge, and the tentative disposition fell apart.[3]

Two years later, Rebecca asked counsel to try again. This time, in mid-2012, the Eastern District of California signed off on the tentative disposition, and Rebecca agreed to surrender. Ironically, when she attempted to surrender to authorities in Canada, they would not take her into custody. In a "Catch 22" situation, they claimed that she was not a risk of flight because she was trying to turn herself in. They also did not regard her as a danger to the community, given the age of the offenses, and there was no extradition warrant.

Rebecca agreed to waive extradition, and on November 29, 2012, arrangements were

---

[3]    No other defendant was required to plead to this charge. In fact, most of the other defendants who were involved in the Litchfield arson, including Stanislas Meyerhoff, Kevin Tubbs, Jennifer Kolar, and Briana Waters, were never charged with any offense in connection with that arson.

completed for her voluntary surrender to one of the case agents at the U.S. border. She did not

seek bail, and has remained in custody since that time. Rebecca pled guilty on October 13, 2013.

Sentencing is scheduled before this Court at 2:00 p.m. on January 27, 2014.

## II. MAXIMUM STATUTORY PENALTY.

The maximum statutory penalty for each count (Class C felonies) is not less than five years

and up to twenty years imprisonment; a fine of up to $250,000.00; a period of supervised release

of up to three (3) years; and a mandatory penalty assessment of $100.[4]

## III. THE PROBATION OFFICE'S GUIDELINES CALCULATIONS .

Probation has calculated the sentencing guidelines (utilizing the 2000 Edition of the

Guidelines Manual) as follows:

> **Group 1, Case No. 6:06-cr-60011, Count 7:** Base Offense Level of 20,
> less 2 levels for minor role pursuant to U.S.S.G. §3B1.2(b), for an
> Adjusted Offense Level 18;

> **Group 2, Case No. 6:06-cr-60011, Count 8:** Base Offense Level of 20,
> less 2 levels for minor role pursuant to U.S.S.G. §3B1.2(b), for an
> Adjusted Offense Level 18;

> **Group 3, Case No. 6:13-cr-00465, Count 2:** Base Offense Level of 20,less 2 levels for min
> Adjusted Offense Level 18;

> **Group 4, Case No. 6:13-cr-00471, Counts 1-8:** Base Offense Level of 6,
> plus 13 levels for loss amount pursuant to U.S.S.G. §2B1.1 and §2B1.3,
> plus 2 levels for more than minimal planning pursuant to U.S.S.G.
> §2B1.3(b)(3), less 2 levels for minor role pursuant to U.S.S.G. §3B1.2(b),
> for an Adjusted Offense level 23.

The total number of units for the grouped counts, according to Probation, is 2.5 units.

Probation added 3 levels to the Greatest Adjusted Offense Level (Group 4), resulting in a

Combined Adjusted Offense Level of 26. Probation then decreased the Adjusted Offense Level

---

[4]    Rebecca has already paid in full the $100 penalty assessment for each count.

**DEFENDANT'S SENTENCING MEMORANDUM - 4**

by 3 levels for acceptance of responsibility pursuant to U.S.S.G. §3E1.1(a) and (b), for a Total

Offense Level of 23, Criminal History Category I. This yields a guideline range of  46-57

months.  Probation recommends a 12 level upward departure pursuant to U.S.S.G. §5K2.0.

Finally, Probation indicates that it will concur in the Government's recommendation for a

downward departure pursuant to U.S.S.G. §5K1.1.

#### IV.  DEFENDANT'S GUIDELINES CALCULATIONS AND OBJECTIONS TO THE FINAL PRESENTENCE REPORT.

#### A.  GUIDELINES CALCULATIONS.

**Group 1, Case No. 6:06-cr-60011, Count 7:**  Base Offense Level of 20, less 2 levels for minor role pursuant to U.S.S.G.  §3B1.2(b), for an Adjusted Offense Level 18;

**Group 2, Case No. 6:06-cr-60011, Count 8:**  Base Offense Level of 20, less 4 levels for minimal role pursuant to U.S.S.G. §3B1.2(a), for an Adjusted Offense Level 16;

**Group 3, Case No. 6:13-cr-00465, Count 2:**  Base Offense Level of 20, less 2 levels for minor role pursuant to U.S.S.G.  §3B1.2(b); for an Adjusted Offense Level 18;

**Group 4, Case No. 6:13-cr-00471, Counts 1-8:**  Base Offense Level of 6, plus 13 levels for loss amount pursuant to U.S.S.G. §2B1.1 and §2B1.3, less 4 levels for minimal role pursuant to U.S.S.G. §3B1.2(a), for an Adjusted Offense level 19.

The total number of units for the grouped counts is 4 units.  Adding 4 levels to the Greatest

Adjusted Offense Level (Group 4) results in a Combined Adjusted Offense Level of 23.  The

Adjusted Offense Level should then be decreased by 3 levels pursuant to U.S.S.G. §3E1.1(a) and

(b), for a Total Offense Level of 20, Criminal History Category I.  This would a guideline range

of 33-41 months.  Based on what the Court did with  the co-defendants in this case, we anticipate

that the Court will make an upward departure of up to 12 levels pursuant to U.S.S.G §5K2.0, as

well as a downward departure pursuant to U.S.S.G. §5K1.1 following a Government motion.

**B. OBJECTIONS AFFECTING GUIDELINES CALCULATIONS.**

**1. Objections Relating to the Arson at U.S. Forest Industries.**

We object to Paragraphs 32 and 65 with respect to Rebecca's role in the attempted arson at U.S. Forest Industries. We submit that Rebecca should receive a four level downward adjustment for minimal role pursuant to U.S.S.G. §3B1.2(a). We base this objection on the fact that Rebecca's co-defendant, Kendall Tankersley, received a two level downward adjustment for minor role, yet she was significantly more involved in the arson at U.S. Forest Industries than was Rebecca.

Rebecca was a late recruit in this arson. According to the Ninth Circuit opinion in *United States v. Tankersley*, 537 F.3d 1100 (9th Cir. 2008):

> " . . . Tankersley, Ferguson, and co-conspirator Kevin Tubbs agreed to target U.S. Forest Industries. The three participated in a "dry run" of the arson. Tankersley hid in a nearby ditch and acted as a lookout for Tubbs and Ferguson. Based on their reconnaissance, Tubbs, Tankersley, and Ferguson decided to recruit a third person.

537 F.3d 1100, at 1104. The third person was Rebecca, who was recruited at the last minute, and she was not involved in any of the planning for this offense. Rebecca's role was to help carry equipment and to act as a lookout. She did not place any of the incendiary devices. Tankersley's role during the failed arson attempt was also to act as a lookout, although she did not enter the property, again hiding in a nearby ditch as she had done during the dry run.

After the incendiary devices were placed, everyone left the area, unaware that the devices had failed to ignite. Later, Tankersley and Ferguson began searching for newspaper articles about a fire at U.S. Forest Industries. When they did not find any news of a fire, Ferguson asked Tankersley to return to Medford to retrieve the devices. She returned to U.S. Forest Industries, where she saw the un-ignited devices, however she did not retrieve them at that time. Thereafter,

as explained by the Ninth Circuit,

> "Tankersley and Ferguson tried again on December 27, 1998. Tankersley agreed to meet Ferguson in Ashland, Oregon. She helped him gather materials to prepare new timing mechanisms for the incendiary devices. Tankersley then drove Ferguson to the neighborhood surrounding U.S. Forest Industries; she watched Ferguson's infant son in the car while Ferguson set the new timing devices on the buckets of fuel. This time the devices properly ignited. After Ferguson returned, Tankersley drove him and his son back to Ashland. She then drove Ferguson's son to a hotel in Dunsmuir, California, and registered in a hotel under a false name. Ferguson joined Tankersley at the hotel later than night."

537 F.3d at 1104-05.

The next day Tankersley returned to Eugene, where she visited Tubbs at his residence. Tubbs and Ferguson then showed her a copy of the communique that was being prepared discussing the successful fire.

Rebecca, on the other hand, had no further involvement in this offense after the initial unsuccessful attempt. Comparing Rubin's role with that of Tankersley, it is clear that Rebecca was significantly less involved. Although the government and Tankersley both advocated for a four level downward adjustment for minimal role, Probation recommended only a two level downward adjustment for minor role. The Court followed Probation's recommendation for only a two level adjustment, largely because Tankersley went back to U.S. Forest Industries after the devices did not ignite in order to ensure that a second arson attempt (in which Rebecca was not involved) was successful. As the Court noted at Tankersley's sentencing hearing:

> "I decline to adjust downward an additional two levels for minimal role in that when you had the choice, you went back. And that was after the device didn't ignite and you went [b]ack, and I just can't ignore that."

537 F.3d at 1108. Because Rebecca was not involved in either the planning or "dry-run," nor

the second successful arson attempt and its aftermath, Rebecca was significantly less involved than Tankersley, and there is no rational way that their roles can be considered equal under the Guidelines.  Consequently, Rebecca should receive a four level downward adjustment for minimal participant.  If the Court is not convinced that a four level downward adjustment is justified, it also has the option of a three level downward adjustment ("In cases falling between (a) and (b), decrease by three levels."  U.S.S.G. §3B1.2).

### 2. Objections Relating to the Arson at Vail, Colorado.

Our next objections relate to Paragraphs 40, 41, 47, 76, and 78 in connection with the arson at Vail, Colorado.  Rebecca's recollection of the facts are different than the facts set forth in Paragraphs 40 and 41.  She recalls that she, Rogers, Gerlach, and Meyerhoff traveled to Vail. Once there, they attempted to transport some of the fuel up the mountain, but they encountered difficulty due to the deep snow.  Sometime after that, Rogers solicited the additional participants who traveled to Colorado to join them.  Once they were all together, they concluded that the original plan was unworkable because there were not enough people and not enough time; there were problems with the ignition devices; there were problems moving the fuel; and many other logistical problems.  Accordingly, they agreed to abort the arson, and Rebecca believes that everyone left the area and traveled to Wyoming (she does not recall that anyone returned directly to Eugene).  She believes that Rogers and Gerlach went back to Colorado (*i.e.*, they did not remain in Colorado) after the arson was aborted.  More importantly, the scope of the arson committed by Gerlach and Rogers, and the manner in which it was done, was very different from anything that Rebecca had discussed.  She was not there when it occurred, and only learned that it had happened when she saw it in the news.

**Paragraph 76, Adjustment for More Than Minimal Planning.**  Rebecca objects to this

adjustment.  Rebecca had no involvement with, nor knowledge of how to use, digital timers.
While it is true that she traveled to Colorado with Gerlach, Rogers, and Meyerhoff, and that she
helped move fuel up the mountain as part of a plan to commit an arson at Vail, those plans were
abandoned, and she left the area.  Indeed, one of the reasons she and the others aborted the arson
was because it had not been sufficiently planned, and  proved to be unworkable.  Rebecca did not
participate in the arson that was later committed by Gerlach and Rogers, and she only learned of
it after it had happened.  The "plan" in which Rebecca had been involved was vastly different in
scope, size, and the manner in which it was to be accomplished than was the arson that was
eventually committed by Gerlach and Rogers.  Accordingly, Rebecca should not receive a two
level upward adjustment for more than minimal planning for an offense that bore little resemblance
to anything Rebecca had contemplated.

     **Paragraph 78, Adjustment for Mitigating Role.**  For the reasons stated above, we also
submit that Rebecca should receive a four level downward adjustment for minimal role pursuant
to U.S.S.G. §3B1.2(a).   We object to the statement in the Addendum that "It was only because
the timing devices failed to ignite that the fire did not start."  There is no factual support anywhere
in the record for that statement.  The weather had little to do with why the original attempt was
aborted (although it did affect the timing devices).  The attempt was aborted because it was ill-
conceived and unworkable.  If the Court does not agree that a four level downward adjustment is
justified, we urge the court to make a three level downward adjustment between minor and
minimal role.

### C. OTHER OBJECTIONS TO FINAL PRESENTENCE REPORT.

     **Page 4, Identifying Data, Citizenship.**   Although she was born in Canada, Rebecca
became a dual United States citizen at birth.  At the time of her birth, 8 U.S.C. §1401(a)(7)

DEFENDANT'S SENTENCING MEMORANDUM - 9

provided:

> The following shall be nationals and citizens of the United States at birth:
>
> > (a)(7) a person born outside the geographical limits of the United States and its outlying possessions of parents one of whom is an alien, and the other a citizen of the United States who, prior to the birth of such person, was physically present in the United States or its outlying possessions for a period or periods totaling not less than ten years, at least five of which were after attaining the age of fourteen years.[5]

Rebecca was born in British Columbia, Canada on April 18, 1973. A copy of her unredacted Birth Certificate is attached to the Sentencing Exhibits as Exhibit A-1. Rebecca's mother, Sandra, is a Canadian citizen. Her father, Jay Rubin, is a United States citizen, born in Baltimore, Maryland on March 26, 1944. A copy of his unredacted Birth Certificate is attached to the Sentencing Exhibits as Exhibit A-2. Rebecca's parents were married in State College, Pennsylvania on May 27, 1967. A copy of the Certificate of Marriage is attached to the Sentencing Exhibits as Exhibit A-3. Jay Rubin lived in the United States from the time of his birth in 1944 through May, 1967, at which time he and Rebecca's mother moved to Canada. See Declaration of Jay Rubin, attached to the Sentencing Exhibits as Exhibit A-4. Accordingly, by statute, Rebecca became a dual United States citizen at birth. She has dual United States citizenship with Canada.[6]

---

[5] This provision is currently codified at 8 U.S.C. §1401(g).

[6] Rebecca's dual citizenship has important consequences in this case. As a United States citizen, she is eligible to serve all or part of her sentence in a Federal Prison Camp. As an alien, she would be excluded from serving any part of her sentence in a Camp. Similarly, as a United States citizen, Rebecca is eligible to serve the final portion of her sentence in a residential reentry facility (half-way house). As an alien, she would not be eligible for placement in a half-way house and would be required to serve her entire term of imprisonment in full custody.

**Paragraph 34.**  Although the Addendum includes Paragraph 34 among the paragraphs that were "amended to clarify defendant's and other participants' roles," the last sentence of Paragraph 34 remains factually inaccurate.  See Objection to Paragraph 34, attached to the Presentence Report.  Rebecca did not contact Darren Thurston.  She and Thurston were contacted independently at approximately the same time.  Rebecca would not have contacted Thurston to participate in this offense because he had not been involved in any of the previous arsons. Someone else contacted him.

## V.  SENTENCING FACTORS.

In order to uphold the constitutionality of the Sentencing Reform Act, the remedial decision in *United States v. Booker*, 543 U.S. 220 (2005), severed the provision making application of the guidelines mandatory.  Thus, after *Booker*, a sentence within the guidelines range may not be necessary to achieve the Congressionally defined purposes of sentencing, as the guidelines are now purely advisory.  A district court is tasked with imposing "a sentence *sufficient, but not greater than necessary,* to comply with the purposes" of section 3553(a)(2).

The United States Supreme Court has made clear that reasonableness is the *appellate* standard of review in judging whether a district court has accomplished that task.  *Rita v. United States,* 551 U.S. 338, 127 S.Ct. 2456, 168 L.Ed.2d 203 (2007).  The Supreme Court has also rejected the notion that a sentence that amounts to a substantial variance from the Guidelines needs to be justified by extraordinary circumstances, holding instead that appellate courts must review all sentences, both within and without the Guidelines range, under a differential abuse-of-discretion standard.  *Gall v. United States,* 552 U.S. 38, 128 S.Ct. 586, 591, 169 L.Ed.2d 445 (2007).

Two subsequent Supreme Court decisions, *Spears v. United States,* 555 U.S. 261, 129 S.Ct. 840, 172 L.Ed.2d 596 (2009) and *Nelson v. United States,* 555 U.S. 350, 129 S.Ct. 890, 172 L.Ed.2d 719 (2009), have reiterated that the Guidelines are now truly advisory and that there is no presumption at the district court level that a Guidelines sentence is inherently reasonable. As stated by the Seventh Circuit, "[t]he district courts must calculate the advisory sentencing guideline range accurately, so that they can derive whatever insight the guidelines have to offer, but ultimately they must sentence based on 18 U.S.C. §3553(a) without any thumb on the scale favoring a guideline sentence." *United States v. Sachsenmaier,* 491 F.3d 680, 685 (7th Cir. 2007).

In determining the particular sentence to be imposed, the Court *shall* consider the nature and circumstances of the offense, and the characteristics of the defendant.  The Court shall also consider the need for the sentence (1) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (2) to afford adequate deterrence to criminal conduct; (3) to protect the public from further crimes of the defendant; (4) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; and (5) to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar offenses.

Of paramount importance to any sentencing determination, however, is that all of these factors are subservient to the §3553(a) mandate to impose a sentence sufficient, but not greater than necessary, to comply with the statutory purposes of sentencing.   *Rita* makes clear that traditional departure analysis under the guidelines survives post-*Booker*.  Thus,  as the Ninth Circuit observes, "*Booker* empowered district courts, not appellate courts, ... [and] breathe[d] life into the authority of district court judges to engage in individualized  sentencing." *United States v. Whitehead,* 532 F.3d 991, 993 (9th Cir. 2008) (citations omitted).

Prior to *Booker,* many of these factors were largely ignored, because they were incompatible with the Guidelines. As one Court observed,

> For example, under §3553(a)(1) a sentencing court must consider the "history and characteristics of the defendant." But under the guidelines, courts are generally forbidden to consider the defendant's age, U.S.S.G. §5H1.1, his education and vocational skills, §5H1.2, his mental and emotional condition, §5H1.3, his physical condition including alcohol or drug dependence, §5H1.4, his employment record, §5H1.5, his family ties and responsibilities, §5H1.6, his socio-economic status, §5H1.10, his civic and military contributions, §5H1.11, and his lack of guidance as a youth, §5H1.12. The guideline's prohibition of considering these factors cannot be squared with the §3553(a)(1) requirement that the court evaluate the "history and characteristics" of the defendant. The only aspect of a defendant's history that the guidelines permit courts to consider is criminal history.

*United States v. Ranum,* 353 F.Supp.2d 984 (E.D.Wis. 2005). Following *Booker*, however, courts must once again consider these factors along with the Guidelines and their policy statements.

## VI. SENTENCING RECOMMENDATION AND APPLICATION OF THE §3553(a) FACTORS TO THIS CASE.

For the reasons set forth below, we submit that a sentence of sixty (60) months would be a sufficient--but not greater than necessary--sentence for Rebecca in this case.

### A. THE NATURE AND CIRCUMSTANCES OF THE OFFENSE AND THE CHARACTERISTICS OF THE OFFENDER.

#### 1. The Offenses.

As stated above, the Court is familiar with the overall nature of the offenses. They were serious, violent, counter-productive and inexcusable. No one knows that more than Rebecca. The only positive thing that can be said is that, thankfully, no one was physically injured, although the economic losses that resulted from these offenses were staggering, and many people's lives, including Rebecca's, were forever changed.

At the same time, it must be noted that Rebecca's role in these offenses was generally as a "lookout," and in the two arsons involving BLM Wild Horse Corrals, her role was to release horses, not set fires.   While this does not in any way excuse her actions, it does help put them in perspective, and the government concedes that she was substantially less culpable than most of the other participants.

## 2. History and Characteristics of the Defendant.

Rebecca Rubin was born in Nelson, British Columbia, Canada on April 18, 1973.   Nelson is located in the Selkirk Mountains in the Southern Interior of British Columbia, an area renown for its natural beauty and wildlife.   As a child, Rebecca began a life-long affinity with nature.

Rebecca's parents separated when she was two, and she and her older brother continued to live with their mother.   When Rebecca was seven, her mother decided to return to nursing school, and the family moved to London, Ontario.   During part of the time her mother was in school, Rebecca and her brother lived with their father, who had moved back to Pennsylvania.

Rebecca later returned to Ontario to finish high school.   In around the eleventh grade,  she attended a presentation by a student animal rights group that showed a video of animals being confined under terrible conditions and being slaughtered.   She was sickened by what she saw, and immediately became a vegetarian, and later a vegan (which she remains to this day). It was this experience that eventually led her into ever-escalating protests against animal abuse.

Shortly after completing high school, Rebecca and her mother, who had completed nursing school, moved to Vancouver, B.C.   Rebecca joined an organization known as Life Force, whose focus was on educating people about ecological matters and threats to the planet.   She also enrolled at Simon Fraser University, where she linked up with several other local animal rights groups, and she began to participate in peaceful and lawful protests.   However, as her frustrations grew, she

became more militant, eventually aligning herself with ELF and ALF.  As Rebecca writes in her

letter to Court which is attached to this Memorandum as Exhibit A:

> Animals and the natural world have always been for me a source of
> profound joy, wonder, and solace, and their mistreatment and
> destruction a source of indescribable pain. . . I reached a point in
> my early twenties when I could no longer contain or appropriately
> channel the grief, despair, and powerlessness I felt in response to
> the mistreatment of animals and the natural world.  The years I had
> spent leafleting, trail building, working in animal sanctuaries,
> peacefully protesting, blockading, hunger striking, canvassing, and
> letter writing, all seemed to have accomplished nothing.  I let my
> frustration and desperation override my ability to make well-
> reasoned decisions; to maintain the calm and patience required of
> slow, sustained struggle; and I failed to seriously consider the
> negative consequences of my actions in both the short and long
> term.

In November of 1997, Rebecca was a last minute recruit in an arson at the BLM Wild

Horse Corrals in Burns, Oregon.  She helped release horses while others placed incendiary

devices.  Thus began her involvement in the conspiracy that brings her before the court for

sentencing.  Rebecca was involved in a total of four arsons.  In the immediate aftermath of the

last incident, which occurred on October 15, 2001, the realization set in that her actions were not

only not achieving the desired results, but that they were actually counterproductive.  She had no

further involvement in the conspiracy after that date.

Rebecca then turned to more productive methods of accomplishing her goals of helping

animals.  She worked as a veterinary assistant, and also worked in several wildlife rehabilitation

centers.  She notes that her "body, mind, heart and soul were finally invested and fulfilled" in this

work, and it is to her everlasting regret that she did not turn to this path earlier.

One of Rebecca's former co-workers from 2002-03 writes as follows:

> Rebecca was also highly respected by her colleagues.  She was an
> excellent teacher who inspired good in those around her; everyone

wanted to get to know her. This supported not only the well being of the animals she cared for; but also the well being of the people around her. In fact, she is one of the most compassionate people I've worked with to date.

What resonates with me most is how Rebecca always showed an honest compassion and the highest respect for all life. In relation to her work, she spent many sleepless nights caring for animals in critical condition to ensure they had the best chance possible. This dedication resulted in the release of countless animals, giving them another chance at life they may not have had otherwise. In relation to people, Rebecca was always there for anyone, no matter what. Whether it was a helping hand or a listening ear; she was supportive without judgement and intuitive to the needs of those around her.

Everything changed in 2006, when Rebecca learned that she had been charged in the United States in connection with these offenses. She saw then United States Attorney General Alberto Gonzales on television, comparing her and her co-conspirators to Osama Bin Laden. She also learned of the suicide of a co-conspirator, and the thought that what lay ahead of her was so terrifying that someone would take their own life paralyzed her with fear. Rebecca panicked, and went "underground." Everything in life that she loved, knew, and trusted were left behind. As she states in her letter:

I lost everything and everybody when I left home, ashamed and in fear of my life. I left behind my belongings, my family, my friends, a job and co-workers that I loved, and all sense of safety and security. My entire world fell away: I lost all external bearings and some internal ones.

The years of living like that took their toll. Although she was no longer involved in any unlawful activity, she was not free. Every time someone looked at her for what seemed like just a little too long, panic would set in. Had she been recognized? Would someone soon come looking for her? Time to move again. She was in a prison without walls. As one her her friends during that time describes her:

**DEFENDANT'S SENTENCING MEMORANDUM - 16**

> She wrestled with inner demons of fear and guilt, sorrow and loneliness. She felt isolated, alone, homeless. She suffered for her mother, who worried constantly, and aunts and uncles and grandparents, who loved her and stood by her in spite of what had happened, and whom she was unable to see. I'm sure she would have undone her actions in a flash if it had been possible. And yet she used this time to try to improve herself – to grow and reflect, to delve into herself, face her inner self fearlessly and with great honesty, and I believe she came to know herself in a deeper way. I feel that she used her time as wisely as she could under the circumstances.

Eventually, Rebecca came to the realization that she had to deal with this matter. Although she had initially read that she was facing "life plus 400 years," once some of the co-defendant's cases had been resolved, she understood that this was something that would not put her in prison for the rest of her life. But turning herself in was not as easy as one might think. She didn't know how to do it, and she couldn't afford to hire a lawyer to give her advise or otherwise counsel her. Fortunately, a friend was able to put her in contact with a highly respected attorney in B.C., who agreed to help her. Thus began the process that resulted in her voluntary surrender.

**B.      THE SERIOUSNESS OF THE OFFENSE; PROMOTING RESPECT FOR THE LAW; AND JUST PUNISHMENT.**

To be sure, the offenses to which Rebecca has pled guilty are serious offenses. But given that (1) Rebecca voluntarily withdrew from the conspiracy before the intervention of law enforcement; (2) her self-motivated rehabilitation extending over the past dozen plus years; her genuine remorse; (4) her assistance to the government by waiving extradition and voluntarily surrendering; and (5) her cooperation in providing the government with a detailed account of her involvement in these offenses, we submit that any sentence in excess of five years this long after the commission of the last offense would not be just, nor would it promote respect for the law.

**1. Rehabilitation**.

Rehabilitation has always been a cornerstone of sentencing jurisprudence. Indeed, two

recent Supreme Court decisions have underscored the importance of both post-offense rehabilitation and post-sentencing rehabilitation. *Gall v. United States, supra; Pepper v. United States,* 562 U.S. ___, 131 S.Ct. 1229, 179 L.Ed.2d 196 (2011).

The Supreme Court reiterated in *Pepper* that "[a] court's duty is always to sentence the defendant as he stands before the court on the day of sentencing." Emphasizing that rehabilitation may critically inform a sentencing judge's overarching duty 'to impose a sentence sufficient but not greater than necessary' to comply with the sentencing purposes set forth in §3553(a)(2), the Court observed:

> It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue. *Koon v. United States,* 518 U.S. 81, 113 (1996). Underlying this tradition is the principle that "the punishment should fit the offender and not merely the crime." *Williams [v. New York],* 337 U.S. at 247; see also *Pennsylvania ex re. Sullivan v. Ashe,* 302 U.S. 51, 55 (1937) ("For the determination of sentences, justice usually requires consideration of more than the particular acts by which the crime was committed and that there be taken into account the circumstances of the offense together with the characteristics and propensities of the offender").

*Pepper v. United States, supra.*

In *Gall,* the defendant joined an ongoing conspiracy distributing ecstasy while he was in college, but withdrew from the conspiracy after seven months. He did not sell or use drugs after that time. Three and one-half years after withdrawing from the conspiracy, the defendant was charged and pled guilty. Although his Guidelines sentencing range was 30-37 months, the District Court judge sentenced the defendant to probation, relying heavily on what he described as the defendant's "self-rehabilitation." The Eighth Circuit Court of Appeals reversed the sentence as substantively unreasonable.

DEFENDANT'S SENTENCING MEMORANDUM - 18

The Supreme Court reversed.  Affirming the probationary sentence, the Court observed:

> The District Court quite reasonably attached great weight to Gall's self-motivated rehabilitation, which was undertaken not at the direction of, or under supervision by, any court, but on his own initiative.  This also lends support to the conclusion that imprisonment was not necessary to deter Gall from engaging in future criminal conduct or to protect the public from his future criminal acts.  See 18 U.S.C. §3553(a)(2)(B),(C).

*Gall v. United States, supra,* 522 U.S. at 59.

So too, here, Rebecca understood the consequences of her criminal conduct after the Litchfield arson in 2001, and ceased her involvement in criminal activity fully five years before the indictments were returned in this case.  She has led a crime free life for more than a dozen years since her involvement in the last offense.  Based on her conduct over this extended period, there is every reason to believe that Rebecca will not re-offend, and that she is not a danger to the community.

Similarly, although it was addressing postsentencing rehabilitation (as opposed to presentencing rehabilitation), the Supreme Court in *Pepper* expounded on the importance evidence of rehabilitation has in sentencing:

> [E]vidence of postsentencing rehabilitation may be highly relevant to several of the §3553(a) factors that Congress has expressly instructed district courts to consider at sentencing.  For example, evidence of postsentencing rehabilitation may plainly be relevant to "the history and characteristics of the defendant." §3553(a)(1).  Such evidence may also be pertinent to "the need for the sentence imposed" to serve the general purposes of sentencing set forth in §3553(a)(2)--in particular, to "afford adequate deterrence to criminal conduct," "protect the public from further crimes of the defendant," and "provide the defendant with needed educational or vocational training . . . or other correctional treatment in the most effective manner."  §§3553(a)(2)(B)-(D); see *McMannus,* 496 F. 3d, at 353 (Melloy, J., concurring) ("In assessing . . . deterrence, protection of the public, and rehabilitation, 18 U.S.C. §3553(a)(2)(B)(C)&(D), there would seem

> to be no better evidence than a defendant's post-incarceration conduct"). Postsentencing rehabilitation may also critically inform a sentencing judge's overarching duty under §3553(a) to "impose a sentence sufficient, but not greater than necessary" to comply with the sentencing purposes set forth in §3553(a)(2).

*Pepper, supra,* 131 S.Ct. 1242.

We submit that Rebecca's law-abiding life over the past twelve plus years is a reliable factor for the Court to consider in assessing her history and characteristics and her "present purposes and tendencies."

### 2. <u>Remorse</u>.

Rebecca, now 40, has had ample time to reflect on these offenses which she committed in her mid-twenties. As she states in her letter to the Court,

> I am sincerely sorry for the grief, fear, and anger that so many people have felt as a result of my actions. I am sorry, too , for the distress I caused to those living in the areas affected by my actions, and to the public in general, as everyone should be able to feel safe and secure where they work and live. I would never have forgiven myself had anyone been injured, or worse, in the fires, and I am disappointed in myself that I took such a risk. I realize that instead of causing damage and destruction, I could have been advocating for, or nursing, or otherwise helping animals, while at the same time retaining my compassion for people.

As observed by Dr. Shabehram Lohrasbe, a highly respected forensic psychiatrist who examined Rebecca,

> [Rebecca] came to recognize that ". . . angry actions are always wrong . . . no matter what." Instead of seeing those who desecrated the planet as faceless corporations greedily ravaging the earth, she began to imagine individual human beings making their own way in life, and becoming stressed, troubled, frightened, saddened, and angered by her actions. Her earlier ideology of "us versus them" was gradually replaced by a recognition that "we're all in this together and have to work it through together."

Lohrasbe Psychiatric Assessment at page 6. A copy of Dr. Lohrasbe's report is attached to

DEFENDANT'S SENTENCING MEMORANDUM - 20

Defendant's Sentencing Exhibit's as Exhibit B.

Rebecca's friend Jasmine McAdam, who has visited Rebecca on several occasions while she has been in custody, makes the following observations regarding Rebecca's remorse:

> "Rebecca is clearly remorseful. She understands that her conduct has affected not only property but people. She understands that… "everyone suffers" and that this is the case regardless of one's world view. She understands that causing others to suffer is not right, and that the constructive way forward is based on compassion. She is sorry that people have been negatively affected by her actions. She is aghast at how her choices have affected her family, especially her mother. She is ashamed at the childishness of the idea that such destructive action could have constructive consequences. She recognizes that she may have unintentionally hindered the environmental and animal rights movements. I doubt she will ever forgive herself."

### 3. **Substantial Assistance**.

The government agrees that Rebecca "has provided substantial assistance by voluntarily surrendering to authorities at the Canada-United States border, obviating the need for her formal arrest and extradition from Canada." Plea Agreement Letter at page 6.

Rebecca also agreed to provide, and did provide, complete and truthful information about the full scope of her participation in all of the offenses in which she was involved.  She also informed the Government that she had no knowledge of the whereabouts of either of the two remaining fugitives.[7]  The Government is satisfied that Rebecca was complete and truthful. The proffers were completed before the Plea Agreement Letter was executed, so the Government knew exactly what it was getting when the Plea Agreement was signed.  The agreement provides that "the Government agrees to recommend up to a 12 level downward departure and/or variance

---

[7]  The Statute of Limitations for these offenses has long since passed, so no other persons can be indicted in connection with these offenses.  The cases of all of the persons who have been indicted have been resolved, other than the two remaining fugitives.

DEFENDANT'S SENTENCING MEMORANDUM - 21

pursuant to U.S.S.G. §5K1.1 and 18 U.S.C. §3553(a), with a final sentence [recommendation] not to exceed 90 months." Rebecca agreed not to request a sentence of less than 60 months.

**C.    THE NEED FOR THE SENTENCE TO AFFORD ADEQUATE DETERRENCE TO CRIMINAL CONDUCT.**

We submit that under the facts of this case, a sentence in excess of five years in prison is not necessary in order to deter others from engaging in similar conduct. A sentence of five years for a minor participant would be comparable to the sentences imposed on similarly situated co-defendants in this case, and should provide more than adequate general deterrence.

**D.    THE NEED TO PROTECT THE PUBLIC FROM FURTHER CRIMES BY REBECCA.**

Rebecca has learned a painful, costly, and lasting lesson as a result of her involvement in these offenses. Under the circumstances of this case, as outlined above, a sentence in excess of five years is not necessary in order to protect the public from further crimes by Rebecca. As observed by Dr. Lohrasbe,

> "To summarize, therefore, Ms. Rubin has experienced both a personal transformation in attitudes, emotions, and intentions as well as a profound shift in her social ideology. Her psychosocial rehabilitation is complete.
>
> *       *       *
>
> She harbours none of the risk factors that typically lead to recurrent acts of violence. All available information indicates that she will live a law-abiding and non-violent life in the foreseeable future."

Lohrasbe Psychiatric Assessment at p. 9-10. Accordingly, there is no need to protect the public from further crimes by Rebecca.

**E.    THE NEED TO PROVIDE THE DEFENDANT WITH REQUIRED MEDICAL CARE.**

There are no significant medical issues in this case.

**F.    THE NEED TO AVOID UNWARRANTED SENTENCING DISPARITY.**

As the Supreme Court observed in *Pepper,* "[a] court's duty is always to sentence the

defendant as he stands before the court on the day of sentencing." Here, Rebecca has led a crime free life since she ended her involvement in these offenses over twelve years ago. Most defendants do not have the opportunity to demonstrate that they have abandoned their criminal activity when they appear for sentencing. Thus, it is more difficult to compare Rebecca to most of her co-defendants in this case, but any leniency the Court shows to Rebecca based on her crime free life over the past twelve plus years is more than justified, and would not constitute an unwarranted sentencing disparity.

Given the parties' agreed sentencing range of between 60 and 90 months, it is appropriate to compare the sentences of the previously sentenced defendants by placing them into two categories: those sentenced to 84 months or more, and those sentenced to less than 84 months.

| More than 84 Months: | Less than 84 Months: |
|---|---|
| Stanislas Meyerhoff (156) | Jennifer Kolar (60)* |
| Kevin Tubbs (151) | Jonathan Paul (51) |
| Chelsea Gerlach (108) | Suzanne Savoie (51) |
| Nathan Block (92) | Briana Waters (48)* |
| Joyanna Zacher (92) | Kendall Tankersley (41) |
| Daniel McGowan (84) | Darren Thurston (37) |
| | Lacey Phillabaum (36)* |
| | Jacob Ferguson (Probation) |

* Jennifer Kolar, Briana Waters, and Lacey Phillabaum were charged in separate cases in the Western District of Washington for their involvement in the massive arson at the University of Washington Horticultural Center, in addition to other offenses (including an arson at the Wray Gun Club in Colorado and the arson at Cavel West in Oregon). They were aligned with ALF and ELF, and both Waters and Kolar also participated with Rebecca in the arson at the BLM Wild Horse Corral in Litchfield, California.

Comparing Rebecca's conduct with the conduct and roles of all of the co-defendants, it

becomes immediately apparent that not even taking into account her 12 plus years of crime free

life, Rebecca's sentence should be much more closely aligned with those of Kolar (60), Paul (51),

Savoie (51), Waters (48), and Tankersley (41), than those of Meyerhoff (156), Tubbs (151),

Gerlach (108), Block (92), Zacher (92), or McGowan (84).

For example, according to the Government's Sentencing Memorandum, "Meyerhoff was

involved in 21 criminal acts which ranged from road vandalism and plant destruction to arsons and

conspiracy to commit murder." He was involved in at least 10 separate arsons, as an organizer,

leader, and recruiter. He designed and built explosives, wrote action manuals, taught others how

to use explosive devices, and purchased firearms. He was also a member of the "Book Club."

Meyerhoff, according to the government, "advocated escalating the level of violence;" "had

conversations with William Rogers about assassinations;" and "had discussed a plan to kill

Jonathan Paul." His guidelines range, before the Government's departure motion, was 360

months to life in prison. A sentence of more than 60 months for Rebecca would seem harsh when

compared to Meyerhoff's sentence, given that she was involved in less than a third of the criminal

activity as was Meyerhoff, and unlike Meyerhoff, Rebecca was only a minor or minimal

participant in the offenses in which she was involved.

Similarly, Kevin Tubbs, who was also a leader, organizer and recruiter, was involved

during a six year span with committing at least 10 separate arsons. According to the government,

"[T]he roles assumed by Tubbs during the arsons included researching and selecting targets,

recruiting others [including Rubin] to participate, providing support for the training of others, and

transporting others during the commission of the arsons." Tubbs' guidelines range, prior to the

Government's motion, was also 360-life, even though he was never charged with the arson at Vail.

Similar to the comparison with Meyerhoff's sentence, a sentence of more than 60 months for

Rebecca would  be unduly harsh when compared to Tubbs' sentence.

Chelsea Gerlach was involved in at least seven separate arsons.  According to the government, "her roles in the crimes of conviction ran the gamut and included research, reconnaissance, lookout, device-assembler, driver, and communique writer."  Gerlach also participated in numerous Book Club meetings.  In addition to arsons, Gerlach

> "joined in criminal activity at various times in the group's campaign against genetic research.  She helped destroy experimental crops in eastern Washington .  After serving as a driver for a similar action near Boardman, Montana, and the tree-girdling at Oregon State University, Gerlach wrote the communiques covering both."  According to the government, "from 2001 until her arrest in December, 2005,  Gerlach supported herself primarily be selling marijuana and ecstacy."  In a search conducted at the time of her arrest, police found false identity evidence.  Gerlach also showed authorities where she and Thurston had buried weapons, ammunition and other items, including two AK-47s, a mini 14, two Glock 9mm handguns, and a Kel-tech.  Gerlach had purchased at least one of the guns.

Government Sentencing Memorandum at pp. 91-92.  The Government is recommending a sentence equal to 85% of Gerlach's sentence, even though Gerlach was a primary organizer of these offenses, and the damage from her actions was second only to that attributable to Meyerhoff.  Given that Rebecca was involved in less than half of the unlawful activity of Gerlach, and that her role was minor compared to Gerlach's role as an organizer, a sentence of 60 months, which is more than half of what Gerlach received, is comparable.

The sentences most similar to the Government's recommendation of 90 months for Rebecca are the 92 month sentences imposed on Nathan Block and Joyanna Zacher, and the 84 month sentence imposed on Daniel McGowan.  Block and Zacher both participated in the WTO riots in Seattle, causing property damage.  In 2000 they participated in the first Book Club meeting, and they continued attending Book Club meetings until the group disbanded in 2001.  According to

the government, Block and Zacher "assisted [William] Rogers in the growing and distribution of marijuana, the proceeds of which were used to finance continued arson operations." In 2001 Block and other members of the Book Club were involved in the destruction of a research wheat crop in Dusty, Washington.

In February of 2001, Block and Zacher were involved in hammering nails and spikes in over 100 trees in the Willamette National Forest, damaging over 39 acres of the trees. A month later they destroyed trees at the Oregon State University poplar farm research facilities in Corvallis and Klammath Falls. Block and Zacher were also involved in the arson at Romania Truck Center in Eugene, purchasing materials, conducting reconnaissance, participating in a dry-run, and ultimately committing the arson, which destroyed 35 vehicles. Shortly after committing the arson at Romania Truck Center, Block and Zacher both participated in the arson at the Jefferson poplar Farm. At the time of their arrest, a marijuana grow was found in their residence. Block's and Zacher's cooperation, like Rebecca's, involved providing details of their own conduct.

However, perhaps as troubling as their conduct during their crime spree, Block and Zacher apparently showed little or no remorse at the time of sentencing, and whether they had sufficiently accepted responsibility for their criminal behavior was a source of some consternation for the Court. Although we do not have a transcript of their sentencing, the Court touched upon that issue at the sentencing of Daniel McGowan (discussing extraordinary cooperation, remorse, or a combination of the two):

> I have departed downward an additional one level for a lesser degree for the same thing, although I question whether your newfound remorse is truly genuine. At a time, for whatever reason, however, you removed yourself from the conspiracy, engaged in positive, productive action, and I will recognize that. In short, I guess, you are not Mr. Block nor Ms. Zacher.

Sentencing Transcript, Daniel McGowan, at page 133 (emphasis supplied).  Comparing their respective conduct throughout the conspiracy and its aftermath (not just the number of arsons in which they participated), it is impossible to justify the imposition of a sentence of 90 months on Rebecca when Block and Zacher received sentences of 92 months.  This is especially true given that Block and Zacher refused to apologize for their conduct, and showed no remorse at sentencing.

That brings us to Mr. McGowan.  After describing a long history of criminal conduct committed by McGowan, who was a leader and organizer, and who attended several Book Club meetings, the Government summarized his involvement as follows:

> Although he participated in only two of the Family's arsons, it is clear McGowan was a totally committed and dedicated lawbreaker from 1997 onward.  He has avoided prosecution for numerous costly crimes in California, Washington, Wisconsin, Oregon, and New York.  Where McGowan has gone, mindless destruction has followed.  His candid recorded remarks in 2005 demonstrate continued commitment to the cause of violence and dedication, if not leadership, in enforcing the code of silence.  By encouraging the re-distribution of Roger's book on electrical timers in 2005, McGowan confirmed his interest in the Family's legacy right up to the time of his arrest.

Government Sentencing Memorandum at pp. 108-09.  McGowan was also a member of the Book Club, and attended several of its meetings.  Moreover, as the Court noted at McGowan's sentencing hearing, his remorse was, at best, questionable:

> And I really have yet to see convincing evidence that you have denounced or condemned your actions or those of your coconspirators.  As late as 2005, you were hailing these, quote, direct actions for the publicity they received and their positive effects on, quote, recruitment, unquote.  And I do find it sort of narcissistic that each and every year on the anniversary of whatever event, you go and you look at the newspapers to see what they are publishing and whether or not they have got any clues that would lead them to you.

McGowan Sentencing Transcript at p. 123.

McGowan's guidelines range, prior to the Government's motion, was 210-262 months. Like Rebecca, McGowan's cooperation was limited to his providing details of his own criminal conduct. He would not talk about others even though he had the benefit and comfort of the group dynamic at the time. Nevertheless, the government moved for a 9 level downward departure, to a sentence range of 92-115 months. The Court departed one additional level, to a range of 84-105 months, and imposed a low-end sentence of 84 months.[8] We do not believe that one can reconcile imposing a more lengthy sentence on Rebecca, or even the same sentence, where McGowan was a leader of the ALF and ELF movement and Rebecca was a follower, especially where Rebecca has clearly demonstrated her remorse, while the extent of McGowan's purported remorse was debatable.

All of the other sentences imposed on any other member of this conspiracy are 51 months or less, with the sole exception being Jennifer Kolar, who was sentenced in the Western District of Washington to 60 months. According to the government, Kolar "was an active member of the Family, participating in several arsons and Book Club meetings." She assisted Jonathan Paul in producing the "Vegan Jell-O" fuel mixture that was used in some of the arsons. She participated in the arsons at Cavel West, and the Wray Gun Club in Wray, Colorado. She was also involved in the arson at the University of Washington Center for Urban Horticulture, hence the prosecution in the Western District of Washington. Finally, she was involved with Rebecca in the arson at the BLM Wild Horse Coral in Litchfield, although she was never charged with that offense. Kolar became disillusioned after the Litchfield arson and, like Rebecca, ended her involvement with the

---

[8]    We believe that in every case except those of Block and Zacher, the Court imposed a sentence of one to two levels below the sentence recommended by the Government

DEFENDANT'S SENTENCING MEMORANDUM - 28

family at that time.  However, unlike Rebecca, she was very actively involved with the Family

prior to that time:

> She participated in actively in the Santa Cruz [Book Club] meeting,
> along with roughly nine others (including Rogers, Meyerhoff,
> Gerlach, McGowan, Block, Zacher, Savoie, and Lacey Phillibaum).
> Kolar shared her extensive expertise in computers by providing
> encryption diskettes and instructing in their use, so the group could
> communicate secretly.  It was at this meeting that the Family
> decided to target biotechnology sites in the future.  Kolar later
> attended a similar meeting in Olympia, where the discussion shifted
> to violent attacks on researchers.  Meyerhoff, Gerlach, Rogers,
> Block, Zacher, McGowan and Phillibaum were present.  Her final
> meeting was the one in Sisters, where it became apparent the Family
> had serious rifts among its members.

Government Sentencing Memorandum at 122-23.

To her credit, Kolar fully cooperated once she was approached by law enforcement, and

she testified at trial against Briana Waters.  Kolar and Rebecca were involved in the same number

of arsons (four).  But unlike Rebecca, Kolar was not found to be a minor participant, and received

no reduction for mitigating role.  For all of these reasons, we submit that a sentence comparable

to the 60 month sentence imposed on  Jennifer Kolar would be equitable, since the Court cannot

sentence Rebecca below the mandatory minimum sentence.

Jonathan Paul and Suzanne Savoie were each sentenced to 51 months.  Jonathan Paul is

commonly acknowledged as one of the important leaders of modern grassroots animal activism.

The Government ascribes to him a history of criminal activity dating back as early as 1986.

Indeed, seven full pages of the Government's Sentencing Memorandum was devoted to cataloging

his crimes.  According to the government, Paul was involved in an arson in April 1987, the first

arson attributed to the ALF.  He was involved an another arson in 1989 at the University of

Arizona in Tucson.  A series of burglaries and other crimes followed until 1997, when he was

involved in the Cavel West arson.  He and Kolar made the fuel for that arson, and he acted as a lookout.  Despite his lengthy involvement with the Family, that arson was the only offense for which he was charged.  Paul's plea agreement, like those of Rebecca, McGowan, Block and Zacher, required him only to provide information about his own criminal conduct.

Suzanne Savoie participated in two arsons: Superior Lumber Company and Jefferson Poplar Farm.  She also helped produce the communique for the Superior Lumber arson.  She also participated in the WTO riots, attended the Earth First! Organizers Conference, and participated in a meeting that was a forerunner to the Book Club.  She became a member of the Book Club, and attended all five of its meetings, which included instruction on such matters as constructing incendiary devices, reconnaissance, computer security, codes, and lock-picking.

While Paul and Savoie were charged with fewer arsons, their overall involvement with the Family's unlawful activity was far greater than Rebecca's involvement.  Thus, a sentence of 60 months for Rebecca would be equitable, given the five year mandatory minimum.

Finally, there is Briana Waters, who was sentenced 48 months in the Western District of Washington.  Waters was involved in the University of Washington Horticultural Center arson, as well as the BLM Wild Horse Corral arson in Litchfield, California.  Waters refused all plea offers, and instead went to trial, putting the government to a huge expense, including an 18 day trial, as well as forcing the victims and several of her co-defendants to testify at trial.  Waters testified in her own defense, and committed perjury (which she later admitted in a Plea Agreement).  At trial she repeatedly denied any involvement in the arsons.  For example, as set forth in the Government's Sentencing Memorandum in U.S.D.C. Western District of Washington Case No. CR05-5828-RBL, Waters was asked:

> Q.    You've heard testimony here from Lacey Phillibaum,

> from Jennifer Kolar, that you were involved in the arson that they committed at the University of Washington in May 2001 . . .

> Q.    Were you in any way involved in that arson?

> A.    No.

Moreover, according to the government, her "defense was characterized by repeated groundless accusations of Government misconduct and judicial bias," and was "also characterized by vicious attacks on cooperating witnesses." Despite her perjured testimony, Waters was found guilty and sentenced to 72 months. She appealed, and her conviction was reversed on an evidentiary ruling.

On remand, Waters agreed to cooperate, and admitted her perjury. At her second sentencing, the court declined to impose either an upward or downward adjustment based on her role in the offense. It did, however, find her guilty of obstruction of justice based on her perjured testimony at trial. Nevertheless, due to her cooperation , which did not require any testimony and mostly served to exculpate a co-defendant, she was sentenced to 48 months. Based on all of these facts, a sentence of 60 months for Rebecca (the mandatory minimum) would be in line with the sentence imposed on Briana Waters.

## VII. CONCLUSION.

We respectfully submit that under all of the facts and circumstances of this case, and for all of the reasons hereinabove set forth, a sentence of sixty (60) months is a sufficient, but not greater than necessary, sentence for Rebecca. We do not see how society would be better served by incarcerating Rebecca for more than five years, particularly so long after she committed the offenses and after she has lived a law abiding life since that time.

### A. Fine.

We concur with Probation's recommendation that any fine be waived in this case.

**B. Supervised Release.**

We submit that no term of supervised release should be imposed in this case.  See 18 U.S.C. §3583(C).  First, there is no statutory requirement that a term of supervised release be imposed. 18 U.S.C.§3583(b)(2).  The 2000 Sentencing Guidelines did provide for at least a two year term for a Class C felony.  That provision was later amended, and currently provides for at least one year term of supervised release for a Class C felony.  But as the Court well knows, the Guidelines are advisory, and the Court is not statutorily required to impose a term of supervised release in this case.  Rebecca committed the most recent offense (Litchfield) over 12 years ago.  By the time she completes a mandatory minimum five year sentence sometime in 2017, it will have been well over 16 years since she committed an offense.  Given that the court is to consider the §3553(a) factors in determining whether to impose a term of supervised release, we submit that no term of supervised release should be imposed in this case.  This is particularly so in light of the fact that once her custodial sentence is complete, Rebecca will be returning to her home in Canada, where supervision would be impractical.

**C. Placement Recommendation.**

Finally, we ask the Court to make a recommendation to the Bureau of Prisons for placement at the minimum security federal prison camp for women at Dublin, California, and to include the following language in the Judgment:

> The Court strongly recommends that the defendant be designated to the minimum security Federal Prison Camp for Women at Dublin, California, the closest appropriate facility to her residence.  If the Bureau is unable to accommodate placement at the minimum security facility, the Court recommends placement at the low security FCI Dublin.  Please see Statement of Reasons regarding minimum security placement.

We also request that the Court include the following language in the "Statement of Reasons"

DEFENDANT'S SENTENCING MEMORANDUM - 32

addendum to the Judgment[9]:

> The Court finds that the Defendant had only a minor role in the instant offenses; that a more than a decade has elapsed since commission of the offenses; that Defendant has remained law abiding during that time; that Defendant is a dual United States citizen; and that Defendant voluntarily surrendered. Accordingly, the Court finds that Defendant is neither a risk of flight nor a threat to the community.

DATED this _2 2_ day of January, 2014.

RICHARD J. TROBERMAN, P.S.

By: _[signature]_

RICHARD J. TROBERMAN
WSB #6379
Attorney for Defendant
Rebecca Rubin

---

[9]  The importance of the Statement of Reasons with respect to placement recommendations cannot be overstated. As set forth in the Federal Bureau of Prisons Program Statement 5100.08, Inmate Security Designation and Custody Classification:

> **Chapter 3, Page 1, Section 1.  Designation Procedures, Subsection d:** If the SOR is not provided with the Judgment, DSCC staff will make a reasonable effort to obtain a copy by contacting the Court or USPO.  If no SOR was prepared for the case or cannot be obtained, DSCC staff will note this in the "Remarks" section of the BP-337 and proceed with the designation process.  *These procedures will ensure the Bureau is following the intentions of the Court when designating a facility, as the SOR may contain information which overrides the PSR and may affect scoring decisions."*  Emphasis supplied.

## CERTIFICATE OF SERVICE

I hereby certify that on January 2 ᵗ, 2014, I electronically filed the foregoing "Defendant's Sentencing Memorandum" with the Clerk of Court, using the CM/ECF system which will send notification of such filing to the attorneys of record in this case.

RICHARD J. TROBERMAN

# EXHIBIT A

The Honorable Ann Aiken
Chief United States District Judge
1000 SW Third Avenue
Portland, OR 97204

Dear Judge Aiken:

I respectfully submit this letter so that you may better know and understand me as an individual apart from my co-defendants and, in several critical ways, different from the young woman who committed the crimes for which I am now being sentenced.

I take absolute responsibility for my actions. I was at all times in charge of my choices and I accept full blame for my mistakes. Although I have changed significantly in the years since I committed these offenses, in my twenties I was willful, driven, and stubborn to a fault. I also struggled at times to balance my emotions with reason. Perhaps this, more than anything, is why I am before you now.

For as long as I can remember, I have been sensitive to the suffering of animals. My favourite books as a young child were Charlotte's Web and Beautiful Joe, both of which centre on mistreated non-human protagonists. I gave my grade seven speech on cruelty to animals, and I read and wrote on environmental and animal issues throughout middle and high school. My whole life I wanted to be (or wished I was) a veterinarian, and were it not for the cruelty inflicted on animals in the schooling, I believe that I would have pursued that goal.

Animals and the natural world have always been for me a source of profound joy, wonder and solace, and their mistreatment and destruction a source of indescribable pain. By way of trying to explain–but not excuse–my actions, I reached a point in my early twenties when I could longer contain or appropriately channel the grief, despair, and powerlessness I felt in response to the mistreatment of animals and the natural world. The years I had spent leafleting, trail building, working in animal sanctuaries, peacefully protesting, blockading, hunger striking, canvassing, and letter writing, all seemed to have accomplished nothing. I let my frustration and desperation override my ability to make well-reasoned decisions; to maintain the calm and patience required of slow, sustained struggle; and I failed to seriously consider the negative consequences of my actions in both the short and long term.

Although at the time I believed my only motivation was my deep love for the earth, I now understand that impatience, anger, egotism and self-righteousness were also involved.  In retrospect, I recognize how immature my actions were.  I am now forty years old and have had much time to reflect on and consider the consequences of my choices, and my thinking has become much more coherent.  I know now that my actions were not merely destructive of inanimate objects but were also harmful to other, feeling human beings.  Had I met the owners or employees at the facilities we destroyed, I could never have burned their buildings and caused them such pain and harm.  Instead, I chose to disconnect from them emotionally and was thus able to dehumanize and vilify them.  In doing so, I thoughtlessly disregarded the adverse emotional and psychological impact that would result from my actions.

I am sincerely sorry for the grief, fear, and anger that so many people have felt as a result of my actions. I am sorry, too, for the distress I caused to those living in the areas affected by my actions, and to the public in general, as everyone should be able to feel safe and secure where they work and live.  I would never have forgiven myself had anyone been injured, or worse, in the fires, and I am disappointed in myself that I took such a risk.  I realize that instead of causing damage and destruction, I could have been advocating for, or nursing, or otherwise helping animals, while at the same time retaining my compassion for people.  I know that kindness toward animals will not be forced or bullied out of people and that when we are attacked, we tend to shut down and defend our positions rather than open up to others.

Although sparing the suffering of animals was my motivation, I have caused immense suffering, not only to strangers whose lives were impacted by my actions, but also to the people who I love and who love me.  I have yet to forgive myself for the pain and turmoil I have caused so many people, and I am profoundly sorry for the negative impact my actions have had on the environmental community and its lawful efforts to effect change.  I also regret that because of my poor choices I have been unable to help animals or the environment in any significant way since I was charged with committing these offenses.

I understand that my unwillingness to come forward during the last six years may be troubling to the Court.  But I want you to know that it was not five years in prison, or even ten, that I was running from, but the fear of 30 years to life in prison. I was terrified to be compared to Osama Bin Laden in the media, and to have my picture on "Most Wanted Terrorist" posters.  I was also saddened and confused by the suicide of a co-defendant who had been arrested.  The thought that what lay in front of me was so terrifying that someone would take their own life made surrendering all the more difficult. The most frightening thing I have ever had to do in my life was to surrender myself to the authorities.  I realize that by not turning myself in sooner I have caused the judicial

-2-

system to have to deal with this again so many years after having originally dealt with it, and I apologize for the additional time and expense this has caused. I also apologize to the victims who now have to re-live this frightening part of their lives.

I also want you to know that although I have no one to blame but myself, living in my self-imposed exile was punishing in itself. I lost everything and everybody when I left home, ashamed and in fear for my life. I left behind my belongings, my family, my friends, a job and co-workers that I loved, and all sense of safety and security. My entire world fell away; I lost all external bearings and some internal ones. I spent months crying myself to sleep; I don't know how I survived the shock of those initial months and I have a difficult time revisiting them even now. I felt like a ghost: unmoored and completely alone. The worst thing about my life was that I was unable to respond to my loved ones, and my mother most of all. I missed my mother's wedding to her second husband, and her retirement ceremonies, and I left her alone to care for her ailing widowed father. It is my most heartfelt prayer that I get through these years in prison in time to be present for my mother as she ages.

Although I am in jail, I am relieved to have rejoined society. A life of hiding and secrecy, as an activist or a fugitive, is not an authentic or contributing way to move through the world. I think—I hope—that I have come through this process a better, wiser, more humble, and more compassionate person. I want to live a responsible life, connected to family, friends, and community and in service to health and peace. I would very much like to resume the wildlife work I was doing during the five years between the time I ended my involvement in these offenses and when I was indicted. It is to my everlasting regret that I failed to choose that work earlier, but I am eager to return to it upon my release. I am excited to return to a life in keeping with what, in spite of my poor choices, I believe is my true nature: one that is respectful, careful, helpful, honest, and loving.

Thank you for taking the time to read and consider this letter.

Respectfully,

Rebecca Rubin